[No. A129946. First Dist., Div. Three. Sept. 19, 2011.]

MONA FIELD et al., Plaintiffs and Appellants, v.
DEBRA BOWEN, as Secretary of State, etc., et al., Defendants and
Respondents;
ABEL MOLDONADO et al., Interveners and Respondents.

**350**

COUNSEL

Gautam Dutta for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Douglas J. Woods, Assistant Attorney General, Zackery P. Morazzini and Mark R. Beckington, Deputy Attorneys General, for Defendants and Respondents.

Nielsen, Merksamer, Parrinello Gross & Leoni, James R. Parrinello, Marguerite Mary Leoni and Christophe Elliott Skinnell for Interveners and Respondents.

OPINION

**SIGGINS, J.**—A group of voters and aspiring congressional candidates challenge the constitutionality of the open primary law, Proposition 14, approved by the voters in June 2010. Plaintiffs contest two aspects of Senate Bill No. 6, the legislation adopted to implement the proposition. (Sen. Bill No. 6 (2009–2010 Reg. Sess.); hereafter Senate Bill 6; see Legis. Counsel's Dig., Sen. Bill No. 6 (2009–2010 Reg. Sess.).) At issue are Elections Code section 13105, which precludes candidates from stating on the ballot a preference for a nonqualified political party, and Elections Code section 8606, which prohibits the counting of write-in votes at the general election for offices covered by Proposition 14.

Our review of relevant case law leads us to conclude both statutes are constitutional. The objection to the party labeling restriction on the ballot is essentially the same as the one rejected in *Libertarian Party v. Eu* (1980) 28 Cal.3d 535 [170 Cal.Rptr. 25, 620 P.2d 612] (*Libertarian Party*). The challenge to the write-in vote counting ban rests on the erroneous premise that Senate Bill 6 allows votes that cannot be counted to be lawfully cast. We therefore affirm the order denying plaintiffs' motion for a preliminary injunction against enforcement of Proposition 14.

## I.  BACKGROUND

### A.  *Proposition 14 and Qualified Parties*

As defined in the Elections Code,[1] the term "party" means "a political party or organization that has qualified for participation in any primary election." (§ 338.) A party qualifies for participation in a primary election by polling a sufficient number of votes at a gubernatorial election (2 percent of the statewide vote), having a sufficient number of voters affiliate with the party (1 percent of the vote at the last gubernatorial election), or by petitioning for qualification with the signatures of a sufficient number of voters (10 percent of the vote at the last gubernatorial election). (§ 5100.) California currently recognizes six qualified parties: American Independent, Democratic, Green, Libertarian, Peace and Freedom, and Republican. (See <http://www.sos.ca.gov/elections/elections_f.htm> [as of Sept. 19, 2011].)

At primary elections before approval of Proposition 14 (Legis. Counsel's Dig., Sen. Const. Amend. No. 4 (2009–2010 Reg. Sess.) p. A-1 et seq.), voters affiliated with a qualified party, and, with permission of the party, voters who declined to state a party affiliation, would vote to select the party's nominee for the general election. The qualified party candidate with the highest vote advanced to the general election as the party's nominee. (See Cal. Const., art. II, former § 5, subd. (b); Elec. Code, former §§ 2151 [amended by Stats. 2009, ch. 1, § 9], 13102, subd. (b) [amended by Stats. 2009, ch. 1, § 45], 15451 [amended by Stats. 2009, ch. 1, § 57].) In addition to party nominees, the general election ballot included candidates who qualified through the process of independent nomination by petition. (See *Libertarian Party, supra*, 28 Cal.3d at pp. 541–542.) Separately, a person could run in the general election as a write-in candidate. (*Id.* at p. 541, fn. 7.)

Proposition 14 replaced party (partisan) primaries with one open primary for the following offices, referred to in the measure and legislation as "voter-nominated" offices: Governor, Lieutenant Governor, Secretary of State, Treasurer, Controller, Insurance Commissioner, Attorney General, state Senators, state Assembly members, state Board of Equalization members, United States Senators, and members of the United States House of Representatives. (Cal. Const., art. II, § 5, subd. (a); Elec. Code, § 359.5.) Candidates for the office are listed on a single primary ballot, voters may vote for any candidate without regard to the political party preference of the candidate or the voter, and the top two votegetters, regardless of party preference, advance to compete in the general election. (Cal. Const., art. II,

---

[1] Subsequent statutory references are to the Elections Code unless otherwise specified.

§ 5, subd. (a).) Partisan elections are retained for the office of President of the United States, political party committees, and party central committees. (Cal. Const., art. II, § 5, subds. (c), (d).)

Proposition 14 became effective on January 1, 2011.

## B. *The Litigation*

Plaintiffs filed suit in July 2010 against the Secretary of State (Secretary) and county election officials to have Senate Bill 6 declared unconstitutional and unenforceable, and Proposition 14 declared "inoperative" due to the unenforceability of Senate Bill 6.[2] Plaintiffs Mona Field, Richard Winger, Stephen A. Chessin, and Jennifer Wozniak are identified in the first amended complaint as voters who "wish[] to vote, and have [their] vote[s] be counted, in future elections for candidates whose names might not appear on the ballot." Plaintiffs Jeff Mackler and Rodney Martin wish to run for the United States House of Representatives "stating a preference" on the ballot for "Socialist Action" and "the Reform Party," respectively.

Former Senator and Lieutenant Governor Abel Maldonado, the legislative sponsor of Proposition 14 and Senate Bill 6, the California Independent Voter Project, "an organization representing the interests of independent ('Decline-to-State') candidates," and Yes on 14—Californians for an Open Primary, the citizens committee that advocated for adoption of Proposition 14 (collectively, interveners), successfully intervened in the case.

Plaintiffs moved for a preliminary injunction against enforcement of Proposition 14 and Senate Bill 6. Arguments on the motion confirmed that plaintiffs were raising facial challenges to Senate Bill 6's constitutionality. The motion was denied, based primarily on plaintiffs' failure to show a likelihood of success on the merits.

## II. DISCUSSION

### A. *Scope of Review*

An appeal from an order granting or denying a preliminary injunction "[o]rdinarily . . . involves a very limited review of the trial court's exercise of discretion concerning two factors: (1) the likelihood that plaintiffs will ultimately prevail and (2) the interim harm plaintiffs will sustain if the preliminary injunction is denied compared to the interim harm defendant will suffer if the injunction is granted pending a final determination of the merits.

---

[2] The local election officials have taken no positions on the issues.

[Citations.] [¶] Occasionally, however, the likelihood of prevailing on the merits depends upon a question of pure law rather than upon evidence to be introduced at a subsequent full trial. This issue can arise, for example, when it is contended that an ordinance or statute is unconstitutional on its face and that no factual controversy remains to be tried. If such a question of pure law is presented, it can sometimes be determinative over the other factor, for example, when the defendant shows that the plaintiff's interpretation is wrong as a matter of law and thus the plaintiff has no possibility of success on the merits. [Citations.]" (*Hunter v. City of Whittier* (1989) 209 Cal.App.3d 588, 595–596 [257 Cal.Rptr. 559] (*Hunter*).)

This case presents no reason to engage in an analysis of the parties' respective hardships. Because plaintiffs' likelihood of prevailing turns entirely on pure issues of law, we may independently review the trial court's determination of the legal issues and pass upon the merits of the case. (See *Citizens to Save California v. California Fair Political Practices Com.* (2006) 145 Cal.App.4th 736, 746 [52 Cal.Rptr.3d 17] ["where a case is clear and no fact questions are presented, a determination on the merits is appropriate and becomes law of the case"]; *North Coast Coalition v. Woods* (1980) 110 Cal.App.3d 800, 805 [168 Cal.Rptr. 95] [where "[t]he issue of the validity of the challenged regulations is solely one of law . . . this court is in as good a position to resolve the issue now as the trial court would be after determination of this appeal"]; see also *King v. Meese* (1987) 43 Cal.3d 1217, 1228 [240 Cal.Rptr. 829, 743 P.2d 889].)

B. *Party Designations on the Ballot*

   (1) *Plaintiffs' Arguments and the Applicable Statutes*

Plaintiffs Mackler and Martin allege in the first amended complaint that their inability under Senate Bill 6 "to state a party preference on the ballot for a non-qualified party" violates their constitutional rights. In their briefing they contend that they have the right, "at a bare minimum," to identify themselves on the ballot as "Independent." They submit that Senate Bill 6's "[nonqualified] [p]arty [p]reference [b]an" violates the First and Fourteenth Amendments, the free speech clause of the California Constitution (Cal. Const., art. I, § 2, subd. (a)), the federal elections clause (U.S. Const., art. I, § 4, cl. 1), and the California equal protection clause (Cal. Const., art. I, § 7). It is unclear whether plaintiffs' Fourteenth Amendment claim refers to the rights to freedom of speech, freedom of association, and equal protection collectively or only to some of them.

Plaintiffs first challenge section 13105, subdivision (a), which, as amended by Senate Bill 6, reads as follows: "In the case of candidates for a

voter-nominated office in a primary election, a general election, or a special election to fill a vacancy in the office of United States Senator, Member of the United States House of Representatives, State Senator, or Member of the Assembly, immediately to the right of and on the same line as the name of the candidate, or immediately below the name if there is not sufficient space to the right of the name, there shall be identified in eight-point roman lowercase type the name of the political party designated by the candidate pursuant to Section 8002.5. *The identification shall be in substantially the following form: 'My party preference is the _____ Party.' If the candidate designates no political party, the phrase 'No Party Preference' shall be printed instead of the party preference identification. If the candidate chooses not to have his or her party preference listed on the ballot, the space that would be filled with a party preference designation shall be left blank."* (Italics added; see Sen. Bill 6, § 46.)

Section 8002.5, subdivision (a), added by Senate Bill 6, provides: "A candidate for a voter-nominated office may indicate his or her party preference, or lack of party preference, as disclosed upon the candidate's most recent statement of registration, upon his or her declaration of candidacy. If a candidate indicates his or her party preference on his or her declaration of candidacy, it shall appear on the primary and general election ballot in conjunction with his or her name. The candidate's designated party preference on the ballot shall not be changed between the primary and general election. A candidate for voter-nominated office may also choose not to have the party preference disclosed upon the candidate's most recent affidavit of registration indicated upon the ballot." (Sen. Bill 6, § 17.)

█ Plaintiffs and the Secretary believe, and we agree, that the term "party" in sections 13105, subdivision (a), and 8002.5 refers to an organization that is a qualified political party as described in section 338. (See § 4 [Elec. Code definitions govern construction of the code "[u]nless the provision or the context otherwise requires"].) Therefore, a candidate's party preference will not be shown on the ballot unless the candidate prefers a qualified party. Candidates like plaintiffs Mackler and Martin who indicate a preference for nonqualified parties like "Socialist Action" or "Reform" will be deemed to not have designated a party preference on their declarations of candidacy (§ 8002.5), and will be identified on the ballot as having "No Party Preference," unless they choose to leave the space for a party preference designation blank. (§ 13105, subd. (a).)

█ Interveners invite us to avoid the constitutional issues plaintiffs raise by construing the term "party" in sections 13105, subdivision (a), and 8002.5

to mean any party a candidate designates, whether qualified or not.[3] We acknowledge that "courts should, if reasonably possible, construe a statute 'in a manner that avoids *any* doubt about its [constitutional] validity.' " (*Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334, 346 [110 Cal.Rptr.3d 628, 232 P.3d 625] (*Kleffman*).) "If a statute is susceptible of two constructions, one of which renders it constitutional and the other unconstitutional (or raises serious and doubtful constitutional questions), the court will adopt the construction which will render it free from doubt as to its constitutionality, even if the other construction is equally reasonable." (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1101 [81 Cal.Rptr.3d 571] (*Jonathan L.*).) We are also mindful that, in the context of a facial challenge to a statute's constitutionality, we should not jump to conclusions about how the statute will be administered. (See *Washington State Grange v. Washington State Republican Party* (2008) 552 U.S. 442, 449–450 [170 L.Ed.2d 151, 128 S.Ct. 1184] ["[c]laims of facial invalidity often rest on speculation," and courts should avoid " 'premature interpretations of statutes' " in such cases].) However, we can be confident that the Secretary's interpretation will govern here (Gov. Code, § 12172.5 [the Secretary administers the Elec. Code]), and interveners' proposed alternative construction is not as reasonable as the Secretary's. Nothing in the language or context of sections 13105, subdivision (a), and 8002.5 suggests that the term "party" as used there means anything other than a qualified party as defined in section 338. (§ 4.)

### (2) *Constitutional Rights and Balancing*

■ Restricting the party label a candidate can use on an election ballot implicates the candidate's constitutional rights to freedom of speech, freedom of association, and equal protection. (See *Libertarian Party, supra,* 28 Cal.3d at pp. 540, 542 [party claimed that its candidates' inability to identify themselves on the ballot as party members violated rights to associate and

---

[3] Plaintiffs argue that interveners should be judicially estopped from arguing both that section 13105 does not prohibit nonqualified party designations on the ballot, and that section 13105 would be constitutional even if it requires that nonqualified party candidates be shown as having "No Party Preference." The judicial estoppel doctrine does not apply. Interveners' arguments are not " 'clearly inconsistent so that one necessarily excludes the other.' " (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 182 [70 Cal.Rptr.2d 96].) Also, plaintiffs maintain that the Secretary and interveners have effectively conceded every point at issue, generally by not citing legal authority in support of their arguments at the earliest opportunity. All of the claims of alleged concessions are fruitless. Legal arguments can be considered at any stage in a case like this that involves purely legal issues and undisputed facts. (*Raphael v. Bloomfield* (2003) 113 Cal.App.4th 617, 621 [6 Cal.Rptr.3d 583].) Moreover, we are obliged to consider points of law not raised by the parties if they would support the trial court's decision. (*R & B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 383 [44 Cal.Rptr.3d 426] [one of "the fundamental rules of appellate review is that we affirm a judgment or order that is correct on any theory"].)

equal protection]; *Schrader v. Blackwell* (6th Cir. 2001) 241 F.3d 783, 788 (*Schrader*) [same]; *Rubin v. City of Santa Monica* (9th Cir. 2002) 308 F.3d 1008, 1013 (*Rubin*) [candidate argued that inability to identify himself on the ballot as a " 'peace activist' " violated his right to freedom of speech].) " '[T]o the extent that party labels provide a shorthand designation of the views of party candidates on matters of public concern, the identification of candidates with particular parties plays a role in the process by which voters inform themselves for the exercise of the franchise.' " (*Schrader, supra,* 241 F.3d at p. 789, quoting *Tashjian v. Republican Party of Connecticut* (1986) 479 U.S. 208, 220 [93 L.Ed.2d 514, 107 S.Ct. 544].)

However, "[s]tates may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." (*Timmons v. Twin Cities Area New Party* (1997) 520 U.S. 351, 358 [137 L.Ed.2d 589, 117 S.Ct. 1364] (*Timmons*).) The United States Constitution grants states "broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices." (*Tashjian v. Republican Party of Connecticut, supra,* 479 U.S. at p. 217 [quoting the federal elections clause].) "[S]tates have significant authority to regulate . . . the identification of candidates on the ballot," and those contesting such regulations "bear[] a heavy constitutional burden." (*Schrader, supra,* 241 F.3d at pp. 790–791.)

■ Federal constitutional challenges to election laws are resolved with a balancing test. "[W]e weigh the ' "character and magnitude" ' of the burden the State's rule imposes on [constitutional] rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. [Citation.] Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's ' "important regulatory interests" ' will usually be enough to justify ' "reasonable, nondiscriminatory restrictions." ' " (*Timmons, supra,* 520 U.S. at p. 358, quoting *Burdick v. Takushi* (1992) 504 U.S. 428, 434 [119 L.Ed.2d 245, 112 S.Ct. 2059] (*Burdick*) and *Anderson v. Celebrezze* (1983) 460 U.S. 780, 788 [75 L.Ed.2d 547, 103 S.Ct. 1564].) The same balancing test is employed to decide election law issues arising under the California Constitution. (*Edelstein v. City & County of San Francisco* (2002) 29 Cal.4th 164, 168 [126 Cal.Rptr.2d 727, 56 P.3d 1029] (*Edelstein*) [Cal. " 'follow[s] closely the analysis of the United States Supreme Court' " in such matters].)

### (3) *The* Libertarian Party *Case Is Controlling*

The relevant considerations in the balancing analysis we must undertake here were applied over 30 years ago in the *Libertarian Party* case. There, two members of the Libertarian Party qualified for a general election ballot "pursuant to the 'independent nomination procedure' [then] set forth in section 6800 et seq." by submitting nomination papers for the offices sought, signed by a sufficient number of voters in their districts. (*Libertarian Party, supra,* 28 Cal.3d at p. 538; see § 8300 et seq.) The Libertarian Party was not at the time a qualified political party in California. Former section 10210, the predecessor to section 13105 at issue here, provided that " 'the qualified political party with which the candidate is affiliated' " would be printed on the ballot next to the name of a candidate, but that " '[i]f a candidate has qualified for the ballot by virtue of an independent nomination, the word "Independent" shall be printed instead of the name of a political party . . . .' " (28 Cal.3d at p. 539, fn. 3.) Following the statute's directive, the Secretary rejected the candidates' demands to be identified on the ballot as "Libertarian," rather than "Independent."

The Libertarian Party sued the Secretary and county election officials, citing its rights to equal protection and due process, and arguing that prohibiting its candidates from having their party identified on the ballot was "an unconstitutional impairment of the fundamental rights to associate for political activity and to vote." (*Libertarian Party, supra,* 28 Cal.3d at pp. 540, 542.) The court reversed a judgment directing that the candidates be designated as "Libertarian" on the ballot, holding that "the identification provision [of former section 10210] imposes an insubstantial burden on the rights to associate and to vote and that the statute serves a compelling state interest to protect the integrity and stability of the electoral process in California." (*Id.* at p. 542.)

In concluding that former section 10210 did not substantially burden constitutional rights, the court observed that the statute "denies access to the ballot to no one. It merely provides for a ballot designation, *party* affiliation." (*Libertarian Party, supra,* 28 Cal.3d at p. 543.) The court also observed that the Libertarian Party "is in no way restricted in its associational activities or in its publication of the affiliation of its candidates. It is only proscribed, so long as it remains unqualified, from designating the affiliation on the ballot." (*Id.* at p. 545.)

"[M]aintenance of the integrity of the distinction between qualified and nonqualified parties serves a compelling state interest and the restriction of party designation on the ballot set forth in section 10210 furthers that interest without substantially impairing the rights of political association and voting."

(*Libertarian Party, supra*, 28 Cal.3d at p. 546.) The court explained that to become qualified, a party needed to demonstrate a threshold of voter support, either through voter registration equal to 1 percent of the statewide vote at the last gubernatorial election, or a petition signed by voters equaling 10 percent of that vote. (*Id.* at pp. 540–541.) " 'There is surely an important state interest in requiring some preliminary showing of a significant modicum of support *before printing the name of a political organization's candidate on the ballot*—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.' " (*Id.* at p. 546, italics added, quoting *Jenness v. Fortson* (1971) 403 U.S. 431, 442 [29 L.Ed.2d 554, 91 S.Ct. 1970] (*Jenness*).)[4]

Given the importance of the state's interest in the integrity of the election process, section 10210 did not unlawfully discriminate against nonqualified political parties. "There is no question that the designation of party beside the name of the qualified party candidate gives information to voters which is not given as to candidates of the nonqualified parties. That distinction, however, is implicit in and essential to an electoral system that places minimum qualifications upon parties to achieve qualified status." (*Libertarian Party, supra*, 28 Cal.3d at p. 545.)

Allowing nonqualified parties to be listed on the ballot would cause " 'deception, and even frustration of the democratic process' " in California. (*Libertarian Party, supra*, 28 Cal.3d at p. 546.) Until a political party becomes qualified, "it is not a *party* whose access to the ballot is secured under the provisions for nomination of qualified party candidates, and it would be misleading to designate the candidate of that political group as a political *party* candidate on the ballot." (*Id.* at p. 544.) "[I]f each independent

---

[4] *Jenness* upheld a Georgia law requiring that candidates who were not affiliated with established parties (those polling over 20 percent of the vote) qualify for the general election ballot by a nominating petition signed by 5 percent of the electorate. The court rejected arguments by registered voters and prospective candidates in the state that the 5 percent requirement "abridge[d] the freedoms of speech and association guaranteed to that candidate and his supporters by the First and Fourteenth Amendments," and "violate[d] the Fourteenth Amendment by denying the nonparty candidate the equal protection of the laws." (*Jenness, supra*, 403 U.S. at p. 434.) The court wrote: "The fact is that there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other. Georgia has not been guilty of invidious discrimination in recognizing these differences and providing different routes to the printed ballot. . . . [¶] There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." (*Id.* at pp. 441–442.)

The issues here and in *Libertarian Party* are those of ballot designations, not the more serious issue of ballot access addressed in *Jenness*, but the analysis of the *Jenness* court applies in both situations.

candidate could decide for himself what nonqualified party he should be listed as affiliated with, the significance of qualified party affiliation would be masked. The legislative purpose in giving substance to party affiliation by limiting party ballot designation to qualified parties would be destroyed." (*Id.* at p. 545.)

We discern no material distinction between the issues presented in *Libertarian Party* and this case. In *Libertarian Party*, as here, constitutional challenges were brought because candidates were unable to use their preferred political party designations on the ballot. Under former section 10210, candidates who wished to be associated with nonqualified political parties were identified on the ballot as "Independent"; under current section 13105 candidates who want to be associated with nonqualified political parties will be identified as having "No Party Preference." In each instance, the statutorily mandated labels are to the same degree both accurate and misleading. The candidates in *Libertarian Party* could be termed "Independent" because they had qualified for the ballot through the process of independent nomination. (*Libertarian Party, supra,* 28 Cal.3d at pp. 538, 544 [noting that fact, and thus in that sense "such candidates *are* independent of the qualified political parties"].) Similarly, the candidates here can be described as having "No Party Preference" because they have not identified themselves with any qualified political party. But the "Independent" label in *Libertarian Party* was misleading insofar as it implied that the candidates there were independent of any party, even though they were in fact members of the Libertarian Party. The "No Party Preference" label here is likewise misleading insofar as it implies that plaintiffs do not subscribe to any political party, even though they identify with parties that are nonqualified. Current section 13105 is in fact less coercive than former section 10210, because it does not, as plaintiffs claim, *force* them to state that they have "No Party Preference"; under section 13105, nonqualified party candidates can choose to leave the space for a party preference designation blank.

Accordingly, we conclude that *Libertarian Party* is controlling and dispositive of plaintiffs' constitutional arguments against the "nonqualified party preference ban" provided in Senate Bill 6.

Plaintiffs argue that *Libertarian Party* cannot be applied here because the case was based on a qualified party system that Proposition 14 and Senate Bill 6 "dismantled" by doing away with partisan primaries. This contention is persuasively refuted in interveners' appellate brief, which identifies many rights that continue to be reserved for qualified parties under the Proposition 14 and Senate Bill 6 open primary system. (Cal. Const., art. II, § 5, subd. (c); Elec. Code, §§ 6000–6953 [exclusive rights of qualified parties to nominate candidates for President of the U.S., participate in presidential primaries, and

limit participation by nonaffiliated voters in presidential primaries]; § 13305 [exclusive right of qualified party to have letter or party contributor envelope mailed with sample ballot to voters registered as preferring that party]; §§ 2151–2152 [state maintains voter registration rolls for qualified parties]; §§ 7000–7882 [state conducts elections for qualified parties' officers and central committees]; see also § 13302, subd. (b) [exclusive right of qualified parties, newly granted under Sen. Bill 6, § 54, to print endorsements for voter-nominated office in the sample ballot].) Consequently, we do not agree with plaintiffs that Proposition 14 and Senate Bill 6 eliminated the distinction between qualified and nonqualified parties that was pivotal to the decision in *Libertarian Party.*

### (4) *Subsequent Cases Support* Libertarian Party*'s Holding*

Decisions after *Libertarian Party* have not called its reasoning into question other than to make clear that the strict scrutiny standard is not applied to review election laws like those here that do not substantially burden constitutional rights. (*Timmons, supra,* 520 U.S. at p. 358.) So, even though *Libertarian Party* applied a more stringent standard than necessary by identifying "compelling" state interests that justified a nonqualified party preference ban, the ban's survival of such heightened scrutiny in *Libertarian Party* only weakens plaintiffs' case. Apart from clarifying the applicable balancing test, subsequent cases support the *Libertarian Party* decision.

The most noteworthy decision, *Timmons, supra,* 520 U.S. 351, 354, involved a constitutional challenge to a Minnesota law that prohibited a candidate from appearing on the ballot as the candidate of more than one party. The Twin Cities Area New Party (New Party) chose as their candidate for state office an individual who was running unopposed for the office in another party's primary. (*Ibid.*) Because that individual had already filed as a candidate for the other party's nomination, election officials refused to accept the New Party's nominating petition. The New Party's arguments against the ban on multiparty, or "fusion," candidacies were essentially the same as those raised by plaintiffs here: "The New Party contends that the fusion ban burdens its 'right . . . to communicate its choice of nominees on the ballot on terms equal to those offered other parties, and the right of the party's supporters and other voters to receive that information,' and insists that communication on the ballot of a party's candidate choice is a 'critical source of information for the great majority of voters . . . who . . . rely upon party "labels" as a voting guide.' " (*Id.* at p. 362.)

The court conceded that the Minnesota law "slightly" limited the New Party's "ability to send a message to the voters," but was "unpersuaded . . . by the Party's contention that it has a right to use the ballot itself to send a

particularized message . . . to the voters, about the nature of its support for the candidate. Ballots serve primarily to elect candidates, not as fora for political expression." (*Timmons, supra,* 520 U.S. át p. 363; see also *id.* at p. 365 [ballot would be transformed "from a means of choosing candidates to a billboard for political advertising" if candidates could identify themselves with newly formed parties such as " 'No New Taxes,' " " 'Conserve Our Environment' " and " 'Stop Crime Now' "].) The court observed that the New Party remained otherwise "free . . . to spread its message to all who will listen" (*id.* at p. 361), and concluded that the fusion ban's burden on the party's associational rights was "not severe" (*id.* at p. 363). Similar reasoning led the court in *Libertarian Party* to conclude that California's law preventing candidates from using nonqualified party labels on the ballot imposed only an insubstantial burden on constitutional rights. (*Libertarian Party, supra,* 28 Cal.3d at pp. 543, 545 [law merely limited ballot designations and did not preclude publication of party affiliation].)

*Timmons* concluded that "the burdens Minnesota's fusion ban imposes on the New Party's associational rights are justified by 'correspondingly weighty' valid state interests in ballot integrity and political stability." (*Timmons, supra,* 520 U.S. at pp. 369–370.) With respect to political stability, the court explained that "the States' interest permits them to enact reasonable election regulations that may, in practice, favor the traditional two-party system, . . . and that temper the destabilizing effects of party-splintering and excessive factionalism. The Constitution permits the Minnesota Legislature to decide that political stability is best served through a healthy two-party system. [Citations.] And while an interest in securing the perceived benefits of a stable two-party system will not justify unreasonably exclusionary restrictions [citation], States need not remove all of the many hurdles third parties face in the American political arena today." (*Id.* at p. 367, citation omitted.) This reasoning strongly supports the decision in *Libertarian Party,* which was based primarily on California's compelling interest in distinguishing between qualified and nonqualified parties. (*Libertarian Party, supra,* 28 Cal.3d at pp. 544–546 [citing, among other things, Cal.'s interest in the stability of its political system].) California's restriction of party labels on the ballot is less constitutionally problematic than the one upheld in *Timmons* because it protects a system of multiple qualified parties, not merely the top two.

Subsequent federal circuit court cases are also in accord with *Libertarian Party. Schrader, supra,* 241 F.3d 783, like *Libertarian Party,* concerned a statute that precluded candidates of nonqualified parties from listing their party affiliations on the ballot. *Schrader* upheld the statute for the same reasons as those identified in *Libertarian Party.* (*Schrader, supra,* 241 F.3d at p. 791, quoting *Timmons, supra,* 520 U.S. at p. 359 [no severe burden on associational rights]; *Schrader,* at p. 788, quoting *Jenness, supra,* 403 U.S. at

p. 442 [importance of state interest that party have significant support].) *Rubin, supra*, 308 F.3d 1008, upheld a regulation that prohibited a candidate from listing "peace activist" as his occupation on the ballot; as in *Libertarian Party*, the candidate had no constitutional right to his preferred description. (*Id.* at p. 1019 [declining to separately address candidate's equal protection and 1st Amend. claims]; see also *Rubin*, at p. 1016 [burden of ballot restriction was "greatly decrease[d]" by candidate's ability to have a " 'Candidate's Statement' " included in the Voter Information Guide]; *Lightfoot v. March Fong Eu* (9th Cir. 1992) 964 F.2d 865, 870–871 [*Libertarian Party* "concluded, correctly" that inability to identify a candidate on the ballot as "Libertarian" did not infringe on the party's freedom of association; party "was free to associate with [the candidate] in every way that counts"].)

### (5) *Plaintiffs' Case Authorities Are Distinguishable*

Plaintiffs cite in support of their position several California cases that preceded the decision in *Libertarian Party*: *Stanson v. Mott* (1976) 17 Cal.3d 206 [130 Cal.Rptr. 697, 551 P.2d 1]; *Gould v. Grubb* (1975) 14 Cal.3d 661 [122 Cal.Rptr. 377, 536 P.2d 1337]; and *Rees v. Layton* (1970) 6 Cal.App.3d 815 [86 Cal.Rptr. 268]. Any light these cases may shed on the issue before us is eclipsed by *Libertarian Party*, which is directly on point. The cases are inapposite. (*Stanson v. Mott, supra*, 17 Cal.3d at pp. 209–210, 217 [public agency cannot expend public funds to promote a partisan position in an election campaign]; *Gould v. Grubb, supra*, 14 Cal.3d at p. 664 [incumbents cannot automatically be afforded a top position on the ballot]; *Rees v. Layton, supra*, 6 Cal.App.3d at p. 818 [incumbents cannot be the only candidates allowed to list their occupation on the ballot].)

Plaintiffs' federal elections clause claim is based on *Cook v. Gralike* (2001) 531 U.S. 510 [149 L.Ed.2d 44, 121 S.Ct. 1029] (*Cook*), which, in the *Rubin* court's words, involved a constitutional provision "stand[ing] in stark contrast" to statutes like Senate Bill 6. (*Rubin, supra*, 308 F.3d at pp. 1015–1016.) Article VIII of the Missouri Constitution instructed members of the state's congressional delegation to support term limits for members of the United States Congress. (*Cook, supra*, 531 U.S. at p. 514.) Missouri senators and representatives who failed to take one of eight specified legislative acts in support of term limits would have the words " 'Disregarded Voters' Instruction on Term Limits' " printed in all capital letters adjacent to their names on primary and general election ballots. (*Ibid.*, capitalization omitted.) Nonincumbent congressional candidates who did not pledge to take one of the enumerated legislative acts would be designated with the words " 'Declined to Pledge to Support Term Limits' " in all capital letters. (*Ibid.*, capitalization omitted.)

Giving candidates such a "Scarlet Letter" on the ballot exceeded the state's power to regulate the " 'Times, Places and Manner' " of congressional elections under the elections clause. (*Cook, supra,* 531 U.S. at pp. 522–526; see U.S. Const., art. I, § 4, cl. 1.) The elections clause is not " 'a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints.' " (*Cook,* 531 U.S. at p. 523.) The labels provided in Missouri Constitution, article VIII "surely place[d] their targets at a political disadvantage to unmarked candidates . . . ." (531 U.S. at p. 525.) The labels implied that term limits were " 'an important—perhaps paramount—consideration in the citizen's choice, which may decisively influence the citizen to cast his ballot' against candidates branded as unfaithful." (*Ibid.*) Article VIII thereby disfavored a class of candidates and attempted to dictate electoral outcomes in violation of the elections clause. (531 U.S. at pp. 525–526.)

The ballot labels required under Proposition 14 and Senate Bill 6 are not comparable to those in *Cook.* The designation "No Party Preference" is not pejorative or issue slanted, and furthers the state's legitimate interest in maintaining its qualified party system. The designation raises no elections clause issue under the reasoning of *Cook.*

We turn finally to *Rosen v. Brown* (6th Cir. 1992) 970 F.2d 169 (*Rosen*), and *Bachrach v. Secretary of Commonwealth* (1981) 382 Mass. 268 [415 N.E.2d 832] (*Bachrach*), which plaintiffs argue stand for the proposition that they are constitutionally entitled to be listed on the ballot as "Independent," rather than as having "No Party Preference." As we have explained, we view the issue in the *Libertarian Party* case, where a candidate who wanted to identify himself as a "Libertarian" and objected to the "Independent" label, to be the same as the one here, where candidates wishing to identify themselves as members of the "Socialist Action" or "Reform" Parties object to being described as having "No Party Preference." If a nonqualified party candidate has no constitutional right to avoid the "Independent" label, then he or she has no such right to avoid the "No Party Preference" label. Nothing in *Rosen* or *Bachrach* persuades us otherwise.

*Rosen* concerned an Ohio statute that prevented candidates who qualified for the general election via a nominating petition from having any designation of party affiliation, or lack thereof, on the ballot. One such candidate requested to be identified on the ballot as "Independent," but the statute required that the space next to his name be left blank; in contrast, the ballot would show the party affiliations of candidates from recognized parties, i.e., Democrats and Republicans. The candidate presented evidence that having no label by his name on the ballot put him at a disadvantage against Democratic and Republican candidates. (*Rosen, supra,* 970 F.2d at pp. 172–173.) The

evidence included testimony from a marketing expert who "stated that Ohio's ballot scheme is the equivalent of putting an unlabeled product on a shelf next to brand name products in a supermarket." (*Id.* at p. 172.)

Based on the evidence, the court concluded that the statute "infringes upon the right of supporters of Independent candidates to meaningfully vote and meaningfully associate by providing a 'voting cue' to Democratic and Republican candidates which makes it virtually impossible for Independent candidates to prevail in the general election." (*Rosen, supra,* 970 F.2d at p. 176.) The opinion further concluded that "the justifications advanced by the state for the burdens imposed on Independent candidates as a result of the statute [were] highly questionable" (*id.* at p. 178), and in fact "somewhat specious" (*id.* at p. 176). The statute appeared to the court to be "nothing more than a deliberate attempt by the State to protect and guarantee the success of the Democratic and Republican parties." (*Ibid.*) The statute thus unconstitutionally burdened "the First Amendment right of individuals to associate for the advancement of political beliefs and the right of qualified voters, regardless of political affiliation, to cast their votes effectively. Moreover, the statute violate[d] the Equal Protection Clause of the Fourteenth Amendment because it place[d] unequal burdens on Independent and third-party candidates and [was] designed to give Democrats and Republicans a decided advantage at the polls in a general election." (*Id.* at pp. 177–178.)

*Rosen* does not support plaintiffs' claim that they should be able to list their preferences for nonqualified parties on the ballot. The Sixth Circuit distinguished *Rosen* when it addressed that issue in *Schrader.* (*Schrader, supra,* 241 F.2d at pp. 788–789.) *Rosen* is also distinguishable insofar as it bears on the question of plaintiffs' alleged right to be called "Independent" on the ballot. Unlike the candidate in *Rosen,* plaintiffs have not presented, and state no intention to present, evidence to support their theory that "No Party Preference" is a more disadvantageous ballot designation than "Independent." On their face the labels are equivalent: someone who is independent of any political party has no party preference. "Independent" may be the more familiar shorthand term for no party affiliation, but it is not apparent that voters would take "No Party Preference" to mean anything other than "Independent," particularly under the new ballot scheme where, in lieu of the traditional party labels, candidates of qualified parties will be shown as having a "preference" for that party (e.g., "My party preference is the Democratic Party," rather than simply "Democrat"). (§ 13105, subd. (a).) In any event, whether the new label will make any practical difference in voters' minds is entirely speculative.

*Bachrach* dealt with Massachusetts laws that permitted candidates to use any nonsubversive, three-words-or-less political designation they wished on

the ballot, other than "Independent"; candidates identifying themselves as "Independent" were described on the ballot as "Unenrolled." (*Bachrach, supra,* 415 N.E.2d at p. 833.) The laws were successfully challenged on First Amendment and equal protection grounds by a candidate who won the right to appear on the ballot as an "Independent." In his campaign literature, the candidate had "consistently described himself as Independent, the designation which to him best expressed his political views . . . ." (415 N.E.2d at p. 834.) The laws subjected the candidate to "invidious discrimination . . . . Whereas any other candidate was allowed to use a designation on the ballot conforming to the rubric he used during the campaign, the candidate who chose, quite legitimately, to campaign under the label Independent, was singled out and denied that expression on the ballot." (*Id.* at p. 836.) The state argued that it could properly "eliminate the one term Independent from political discourse, at least on the ballot, on the one hand because it was ambiguous or confusing, and on the other hand because it had a positive aura and hence might give a candidate using the designation an unmerited advantage." (*Id.* at p. 837, fn. omitted.) The court responded that it was "hard to take the argument seriously when one looks at the agreed facts and considers what soubriquets unaffiliated candidates were permitted to adopt . . . apart from the word Independent." (*Ibid.*)

The agreed facts were as follows: "Independent had no consistent or uniform meaning except a customary meaning as referring to persons who do not formally affiliate with any political party. Many voters assumed individuals designated Independent had generally liberal political or ideological beliefs, but many thought such individuals had generally conservative, generally moderate, or generally progressive beliefs. Independent had a generally positive connotation. 'Citizens Party,' which was to appear as a designation of a candidate on the 1980 ballot, had no consistent or uniform meaning. The designations 'Against Politician's Raise' and 'The Anderson Coalition,' also to appear as designations on that ballot, did not connote associations with established organizations having structures or traditions of political beliefs. The terms Democratic and Republican did connote such associations." (*Bachrach, supra,* 415 N.E.2d at p. 834.) The court thought that "Unenrolled" was a less favorable designation than "Independent," a point the state may have effectively conceded. "Voters who during the campaign might have been favorably impressed with the candidate as an Independent would be confronted on the ballot with a candidate who was called Unenrolled. Unenrolled is hardly a rallying cry: the Commonwealth in its brief appears to grant the possibility that the word would have a negative connotation for voters." (*Id.* at p. 836.)

*Bachrach,* like *Rosen,* provides little support for plaintiffs' case. Unlike the laws in *Bachrach* that narrowly and without justification singled out Independents for disparate treatment, the statute challenged here distinguishes

broadly and justifiably between qualified and nonqualified parties, a distinction the *Bachrach* court signaled it could support. (See *Bachrach, supra*, 415 N.E.2d at p. 835, fn. 13 [citing *Jenness, supra*, 403 U.S. at pp. 441–442, and "indicat[ing] that some differential treatment of candidates of established parties and Independent candidates is to be expected and is reasonable, and to that extent should raise no constitutional difficulties"].) And *Bachrach*'s endorsement of the designation "Independent" over "Unenrolled" does not support favoring "Independent" over "No Party Preference" here because in *Bachrach* it was stipulated that "Independent" had a "generally positive connotation," and conceded that "Unenrolled" could possibly have a "negative connotation." (*Bachrach, supra*, 415 N.E.2d at pp. 834, 836.) No evidence, stipulation, or concession in this case establishes that "Independent" would have a more positive connotation than "No Party Preference" on ballots for a voter-nominated office; much less that the advantage of using one term over the other would be sufficient to raise a constitutional issue.

## C. Prohibition on Counting Write-in Votes

### (1) Plaintiffs' Premise

Plaintiffs challenge section 8606, added by Senate Bill 6, which provides: "A person whose name has been written on the ballot as a write-in candidate at the general election for a voter-nominated office shall not be counted." (Sen. Bill 6, § 35.)

Plaintiffs do not dispute that under *Burdick, supra*, 504 U.S. 428, and *Edelstein, supra*, 29 Cal.4th 164, the state may validly ban write-in voting in a general election. *Burdick* rejected a federal constitutional challenge to Hawaii's prohibition of write-in votes in all elections. (*Burdick, supra*, 504 U.S. at pp. 430, 441–442.) *Edelstein* applied *Burdick* and held that a prohibition against write-in voting in a San Francisco mayoral runoff election did not violate California's free speech clause. (*Edelstein, supra*, 29 Cal.4th at pp. 168–169, 177–183.)

However, plaintiffs maintain that Senate Bill 6 preserves the right to *cast* write-in votes in the general election for voter-nominated offices, even though section 8606 prohibits those votes from being *counted*. Based on the premise that the casting of write-in votes is permitted, plaintiffs contend that section 8606 violates California Constitution, article II, section 2.5, which states: "A voter who casts a vote in an election in accordance with the laws of this state shall have that vote counted." Plaintiffs argue that section 8606 also violates the First Amendment and California's free speech clause; the federal elections clause; and the due process clauses of the federal and state Constitutions.

### (2) *Our Analysis and Conclusion*

It would make no sense to authorize the voters to cast votes that cannot be counted, and we are not persuaded that Senate Bill 6 so provides. A ban on write-in votes in general elections for voter-nominated offices is implicit in section 8606, particularly when that statute is read together with section 8141.5 (added by Sen. Bill 6, § 27), which provides that "[o]nly the two candidates for a voter-nominated office who receive the highest and second-highest numbers of votes cast at the primary shall appear on the ballot as candidates for that office at the ensuing general election." (See also Cal. Const., art. II, § 5, subd. (a) [top two votegetters compete in the general election].) The Assembly Bill Analysis of Senate Bill 6 persuasively explained that the measure "[e]liminates the ability of voters to write-in candidates for a voter-nominated office at a general election, and eliminates the ability of candidates to run as write-in candidates for a voter-nominated office at a general election." (Sen. 3d reading analysis of Sen. Bill 6 as amended Feb. 19, 2009, p. 2 <http://www.leginfo.ca.gov/pub/09-10/bill/sen/sb_0001-0050/sb_6_cfa_20090219_074318_asm_floor.html> [as of Sept. 19, 2011].)

Notably, plaintiffs' current reading of Senate Bill 6 is contrary to the arguments of the opponents of Proposition 14 in the June 2010 Voter Information Guide that clearly state write-in votes would be prohibited. The argument against Proposition 14 stated: "The general election will not allow write-in candidates. [¶] . . . [¶] Currently, when a rogue candidate captures a nomination, voters have the ability to write-in the candidate of their choice in the general election. But a hidden provision PROHIBITS WRITE-IN VOTES from being counted in general elections if Prop. 14 passes. [¶] That means if one of the 'top two' primary winners is convicted of a crime or discovered to be a member of an extremist group, voters are out of luck because Prop. 14 ends write-in voting." (Voter Information Guide, Primary Elec. (June 8, 2010) argument against Prop. 14, p. 19.) The rebuttal to the argument in favor of Proposition 14 (cosigned by plaintiff Chessin) stated: "Proposition 14 will decrease voter choice. It prohibits write-in candidates in general elections. Only the top two vote getters advance to the general election regardless of political party." (*Id.*, rebuttal to argument in favor of Prop. 14, p. 18.)

Accordingly, we conclude that Senate Bill 6 precludes the casting of write-in votes at general elections for voter-nominated offices, just as it prohibits the counting of those votes. This conclusion disposes of plaintiffs' argument that section 8606 violates California Constitution, article II, section 2.5, because that section requires that votes be counted only if they are cast "in accordance with the laws of this state." This conclusion resolves plaintiffs' other constitutional arguments against section 8606 because votes that

have been lawfully banned (*Burdick, supra,* 504 U.S. at pp. 441–442; *Edelstein, supra,* 29 Cal.4th at pp. 168–169) need not be counted. Our conclusion also distinguishes plaintiffs' case authority. (*United States v. Classic* (1941) 313 U.S. 299, 315 [85 L.Ed. 1368, 61 S.Ct. 1031] [qualified voters have a constitutional right "to cast their ballots and have them counted"]; *Turner v. D.C. Bd. of Elections & Ethics* (D.D.C. 1999) 77 F.Supp.2d 25, 33 [failure to count a lawfully cast vote "rob[s] the vote of any communicative meaning whatsoever"]; *Libertarian Party v. D.C. Bd. of Elections & Ethics* (D.D.C. 2011) 768 F.Supp.2d 174, 182 ["having granted citizens the right to cast write-in votes, the District of Columbia must confer the right in a manner consistent with the Constitution"].)

### (3) *Plaintiffs' Statutory Arguments*

Plaintiffs argue that certain Elections Code provisions authorize write-in voting at general elections for voter-nominated offices, notwithstanding sections 8141.5 and 8606. We disagree.

■ "In construing a statute, the court's fundamental task is to ascertain and effectuate the intent of the Legislature." (*Johnson v. Arvin-Edison Water Storage Dist.* (2009) 174 Cal.App.4th 729, 734 [95 Cal.Rptr.3d 53].) The statutes plaintiffs cite must be construed "in the framework of the . . . election processes of which [they are] but a part." (*Libertarian Party, supra,* 28 Cal.3d at p. 540.) We must attempt to harmonize them with the section 8141.5 and 8606 directives that only the top two candidates from the primary are to appear on the general election ballot, and that write-in votes are not to be counted. (*McCarther v. Pacific Telesis Group* (2010) 48 Cal.4th 104, 110 [105 Cal.Rptr.3d 404, 225 P.3d 538] [the words of a statute " 'must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible' "]) We must also, if possible, construe the statutes in question so as to preserve their constitutionality. (*Kleffman, supra,* 49 Cal.4th at p. 346; *Jonathan L., supra,* 165 Cal.App.4th at p. 1101.)

■ Plaintiffs rely primarily on section 15340, which was not amended by Senate Bill 6, and which provides: "Each voter is entitled to write the name of any candidate for any public office, including that of President and Vice President of the United States, on the ballot of any election." But it is clear from the decision in *Edelstein* that section 15340 does not mandate allowance of write-in voting in general elections for voter-nominated offices. The plaintiffs in *Edelstein* argued that section 15340 guaranteed voters the right to cast write-in votes in a municipal runoff election. The court rejected that argument and explained that voters in the election "had the opportunity to write in the names of candidates once, in the first round of voting; they

simply did not have the opportunity to do so a second time, in the runoff. This satisfied section 15340, because there was a single *election*, although there were two rounds of voting." (*Edelstein, supra,* 29 Cal.4th at p. 174.) "[V]oters were not denied an opportunity to cast a write-in ballot for the candidate of their choice. They were only denied the opportunity to cast a write-in ballot *twice*." (*Id.* at p. 182.) *Edelstein*'s reasoning applies equally in this case. There is one election, within the meaning of section 15340, for voter-nominated offices, with two rounds of voting—the primary and general elections—and allowance of write-in votes at the primary satisfies the statute.

Plaintiffs' reliance on section 15342 is also misplaced. Section 15342 states that "[a]ny name written upon a ballot for a qualified write-in candidate, including a reasonable facsimile of the spelling of a name, shall be counted for the office, if it is written in the blank space provided and voted as specified [in subdivisions of the section]." This provision is of no assistance to plaintiffs because it is limited by its terms to votes cast for "qualified" write-in candidates. Section 15341 states that "[n]otwithstanding any other provision of law, no name written upon a ballot in any election shall be counted for an office or nomination unless the candidate whose name has been written on the ballot has complied with Part 3 (commencing with Section 8600) of Division 8." Section 8600 et seq. set forth requirements for qualifying as a write-in candidate, and now include section 8606's ban on the counting of write-in votes at general elections for voter-nominated offices. We agree with the Secretary and interveners that, in view of that ban, no write-in candidate can be "qualified" for those elections. Like the prohibition against casting write-in votes at such elections, a prohibition against qualifying as a write-in candidate in such elections is implicit in sections 8606 and 8141.5.

Plaintiffs also cite section 13207, subdivision (a)(2), which provides: "(a) There shall be printed on the ballot in parallel columns all of the following: [¶] . . . [¶] (2) The names of candidates with sufficient blank spaces to allow the voters to write in names not printed on the ballot." (See also § 13212 ["Under the designation of each office shall be printed as many blank spaces, defined by light lines or rules at least three-eighths of an inch apart but no more than one-half inch apart, as there are candidates to be nominated or elected to the office."].) These statutes are among those in section 13200 et seq. providing general specifications for the format of all ballots. Because Senate Bill 6 amended parts of section 13207, but left subdivision (a)(2) unchanged (Sen. Bill 6, § 50), plaintiffs assert that "SB 6 itself requires that every ballot provide space where voters can write in the names of candidates."

The Secretary and interveners differ on whether sections 13207, subdivision (a)(2), and 13212 apply in general elections for voter-nominated offices. Interveners argue that these statutes provide "specifications for blank write-in spaces on all ballots for offices for which write-in voting is permitted. . . . [¶] Since only the two candidates for a voter-nominated office who receive the highest and second-highest numbers of votes at the primary can appear on the ballot at the ensuing general election (§ 8141.5), there are no write-in candidates, and no blank spaces would be printed below the names of the candidates. However, because write-in voting is still permitted in voter-nominated primary elections, and all presidential, partisan, and local elections, which are often held at the same time as voter-nominated general elections, § 13207 and § 13212 continue to provide for the inclusion of write-in spaces to accommodate the names of persons who have qualified as write-in candidates in those elections."

The Secretary's appellate brief does not discuss these statutes, but the Secretary has evidently concluded, after the brief was filed, that the statutes require lines for write-in votes for voter-nominated offices on general election ballots. In a March 17, 2011 memorandum to county clerks and registrars of voters, the chief of the Secretary's election division "advise[d] that consistent with [Elections Code] sections 13207(a) and 13212, ballots must contain a blank space below the names of the qualified candidates. However, consistent with [Elections Code] section 8606, any name that is written on the ballot as a write-in candidate at the general election for a voter-nominated office shall not be counted."[5]

The Secretary's position is also reflected in August 2010 e-mails from a legislative analyst for the Secretary to intervener Maldonado's legislative staff. The e-mails proposed "an SB 6 cleanup bill" consisting of "technical changes/clarifications" that would not "make any policy changes. . . . [¶] It's not intended to be controversial. It's simply intended to ensure that Proposition 14 and SB 6 can be implemented clearly and easily—and be implemented as the voters, the author, the Legislature, and the Governor intended when the measures were approved." Among the changes proposed was an amendment to section 13212, adding a sentence at the end so the section would read: "Under the designation of each office shall be printed as many blank spaces, defined by light lines or rules at least three-eighths of an

---

[5] We hereby grant plaintiffs' request to take judicial notice of this document. (Evid. Code, § 452, subd. (c) [official state governmental acts]; *Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 374–375, fn. 4 [87 Cal.Rptr.2d 654, 981 P.2d 499].) Apart from this document, it has been unnecessary for us in deciding this case to consult or cite any of the other documents we have been requested to judicially notice. Consequently, the other requests for judicial notice are denied on the ground of irrelevance. (*Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 544, fn. 4 [67 Cal.Rptr.3d 330, 169 P.3d 559].)

inch apart but no more than one-half inch apart, as there are candidates to be nominated or elected to the office. *No blank spaces shall follow the name of a candidate at the general election for a voter-nominated office.*" Changes were also proposed to sections 8606 and 15340. Section 8606 would be amended to read: "A person *cannot be a write-in candidate at the general election for a voter-nominated office. A person* whose name has been written on the ballot as a write-in candidate at the general election for a voter-nominated office shall not be counted." Section 15340 would be amended to read: "Each voter is entitled to write the name of any candidate for any public office, including that of President and Vice President of the United States, on the ballot of any election, *with the exception of a voter-nominated office at a general election.*"

As for the amendment to section 13212, the e-mails explained: "The requirement that general election ballots contain spaces for write-ins should be deleted, since EC 8606 . . . specifies that a name written on the ballot at a general election for a voter-nominated candidate shall not be counted." The e-mails elaborated, with respect to that amendment and the others pertaining to write-in voting: "Since [Senate Bill 6] precludes [write-in] votes from being counted, it makes no sense to give candidates the illusion that they can run as a write-in or give voters the illusion that they can write in a candidate's name and have it counted. . . . There's no reason you couldn't do it the other way, too, and eliminate the provision about not counting write-in votes. We have no preference, we just think in the long run, it should be consistent."

The interpretation of sections 13207, subdivision (a), and 13212 set forth in the Secretary's March 2011 memorandum to require spaces for write-in votes for voter-nominated offices on general election ballots is at odds with the interpretation reflected in the Secretary's August 2010 e-mails. In those e-mails, the Secretary proposed that section 13212 be clarified, consistent with the Secretary's view of legislative intent, to provide that spaces for write-in votes *not* be included for voter-nominated offices on general election ballots. The March 2011 interpretation contravenes that legislative intent and, as noted in the August 2010 e-mails, gives voters "the illusion" that write-in votes will be tabulated, or, as plaintiffs put it, *"trick voters into throwing away their votes."*

■ Including a line for write-in votes on a ballot when those votes will not be counted raises constitutional questions. " '[T]he right at stake' " when the constitutionality of a write-in voting ban is considered " 'is the right to cast a *meaningful* vote for the candidate of one's choice.' " (*Edelstein, supra,* 29 Cal.4th at p. 181, italics added; see also *id.* at p. 186 (conc. opn. of Moreno, J.) [voters deprived of this right are "effectively *disenfranchised*" (original italics)]; *Rawls v. Zamora* (2003) 107 Cal.App.4th 1110, 1114 [132

Cal.Rptr.2d 675] [qualified voters have the right "to cast their votes *effectively*" (italics added)].) We must, if possible, avoid a construction of sections 13207, subdivision (a)(2), and 13212 that casts doubt on their constitutionality and potentially could lead to disenfranchising voters. (*Kleffman, supra,* 49 Cal.4th at p. 346; *Jonathan L., supra,* 165 Cal.App.4th at p. 1101.) These statutes can be reasonably interpreted, as interveners advocate, to apply only when write-in voting is permitted for an office. We agree with, and adopt, this construction, which gives effect to the statutes whenever such voting is authorized after the adoption of Proposition 14, and avoids the constitutional issues raised by the Secretary's interpretation. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8 [78 Cal.Rptr.2d 1, 960 P.2d 1031] [ultimate responsibility for statutory interpretation rests with the court, not the agency administering the statute].) There is no reason to conclude the Legislature intended to induce voters to cast votes that will not be counted (see *Johnson v. Arvin-Edison Water Storage Dist., supra,* 174 Cal.App.4th at p. 734), and our interpretation of these ballot statutes harmonizes them with sections 8606 and 8141.5 (*McCarther v. Pacific Telesis Group, supra,* 48 Cal.4th at p. 110). No lines or spaces for write-in votes for voter-nominated offices can be placed on general election ballots.

That the Secretary drafted "cleanup" legislation to amend statutes we have discussed does not affect our conclusions about how those statutes should be interpreted. The legislation was offered only to ensure that Proposition 14 would be implemented as intended, and the legislative intent reflected in the proposed amendments can be discerned without the changes the Secretary proposed.

Plaintiffs submit finally that write-in votes must be authorized at general elections for voter-nominated offices because, if they were not, section 8606's prohibition against counting them would be superfluous. However, candidates will presumably be written in on some ballots even when no lines for write-in votes are provided, and section 8606 can be taken to cover that situation.

D.   *Conclusion*

We have determined as a matter of law that plaintiffs' arguments on the merits are untenable. Since plaintiffs have demonstrated no likelihood of prevailing, it is unnecessary for us to balance the hardships involved in granting or denying a preliminary injunction. (*Hunter, supra,* 209 Cal.App.3d at pp. 595–596.)

## III.  DISPOSITION

The order denying the motion for a preliminary injunction is affirmed.

McGuiness, P. J., and Jenkins, J., concurred.