Filed 1/29/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| MICHAEL RUBIN et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>ALEX PADILLA, as Secretary of State, etc.,<br><br>    Defendant and Respondent;<br><br>INDEPENDENT VOTER PROJECT et al.,<br><br>    Interveners and Respondents. | A140387<br><br>(Alameda County<br>Super. Ct. No. RG11605301) |

Three small political parties and several party members and candidates sought to invalidate California's electoral system for statewide and legislative offices, contending the system, which consists of an open nonpartisan election followed by a runoff between the top-two candidates, deprives them of equal protection and associational and voting rights secured by the state and federal Constitutions. According to plaintiffs, because "minor" party candidates are typically eliminated in the primary election, they are denied the constitutional right to participate in the general election upon a showing of substantial public support. Plaintiffs also contend their associational rights are violated by the effective limitation of their participation to the primary election, when voter participation is typically less than half that of the general election. In addition, plaintiffs claim the electoral system denies them equal protection because they are no longer able to regularly participate in the general election, as they were under the prior electoral system. Finally, plaintiffs contend the trial court erred in granting a demurrer to their complaint, without permitting them a hearing on the evidentiary support for their claims.

We affirm the trial court's dismissal of the action. Given the structure of California's "top-two" electoral system, minor-party candidates have no right to appear on the general election ballot merely because they have made a showing of significant public support. The role played by the general election under the former partisan system is fulfilled by the primary election in the top-two system, and there is no material barrier to minor-party participation in the primary election. Further, the failure of minor-party candidates to appear on the general election ballot does not substantially burden their members' rights of political association and expression, and California's interest in expanding participation in the electoral process is adequate to justify any burden that may occur. Lastly, because California's electoral system treats all political parties identically, plaintiffs' claim that they are denied equal protection of the laws is groundless.

## I. BACKGROUND

In November 2011, plaintiffs filed an action against the Secretary of State (the Secretary) challenging the constitutionality of California's "top-two" system for electing statewide and legislative officeholders, enacted by the passage of Proposition 14 in 2010. The top-two system consists of an open nonpartisan primary followed by a general election runoff between the primary's top-two vote-getters. Plaintiffs consist of three "minor" political parties, the Green Party of Alameda County, Libertarian Party of California, and Peace and Freedom Party of California, several minor-party members, and four potential minor-party candidates for offices subject to the challenged electoral process.[1]

---

[1] By convention, we use the term "minor party" to refer to any political party other than the Republican and Democratic parties, without intending to demean the importance or standing of such parties. The individual plaintiffs are Michael Rubin, Steve Collett, Marsha Feinland, Charles L. Hooper, Katherine Tanaka, C.T. Weber, and Cat Woods. The complaint identifies Rubin and Tanaka as members of the Green Party of Alameda County and the Green Party of California, Woods as a member of the Peace and Freedom Party of California, Collett and Hooper as members of the Libertarian Party of California and 2012 legislative candidates from that party, and Feinland and Weber as members of the Peace and Freedom Party of California and 2012 legislative candidates from their party.

The operative pleading, plaintiffs' second amended complaint (complaint), alleges two causes of action under the state and federal Constitutions, contending the top-two system denies plaintiffs access to the ballot because it precludes minor-party candidates from participating in the general election, even when they have demonstrated "substantial support" in the primary election, and denies equal protection because it was designed by the drafters of Proposition 14 to accomplish just such exclusion. The trial court permitted several persons and entities to intervene to defend the top-two system, including Abel Maldonado, a former state Senator who was involved in the passage of Proposition 14.[2]

In support of their constitutional claims, plaintiffs allege that in 2012, the most recent election year prior to the filing of the complaint, nine minor-party candidates in California received 5 percent or more of the primary vote in races governed by the top-two system. Many other minor-party candidates received over 2 percent of the vote. The primary's leading minor-party vote-getter, from the Green Party, received 18.6 percent of the vote for a seat in the United States Congress. Yet none of these candidates appeared on the general election ballot, since they failed to place in the top-two positions. Out of more than 150 races governed by the top-two system in the 2012 election, only three minor-party candidates advanced to the general election. Accordingly, the minor parties were represented by no general election candidate for 98 percent of statewide and legislative offices.

According to the complaint, this placed a substantial limitation on the ability of minor-party candidates to participate in the electoral process because "the California general election ballot is the moment of peak participation by voters, media, and the candidates themselves." Less than half the number of voters statewide participated in the 2012 primary election than the general election—5.3 million voters in the primary compared to 13.2 million in the general election. This effect was accentuated by the scheduling of the primary in June, five months before the general election. After the

---

[2] The other interveners are Californians to Defend the Open Primary, Independent Voter Project, and David Takashima.

passage of five months between the primary and general elections, the complaint alleged, "whatever messages the [minor] parties were able to disseminate during their primary election participation had likely dissipated."

The complaint also alleges that, prior to implementing the current process, California's election laws guaranteed that one candidate from each qualified political party could appear on the general election ballot. In contrast, the current process permits only two candidates on the general election ballot, typically excluding most of the minor-party candidates. According to the complaint, the intent of the drafters of Proposition 14 was to bring about this exclusion, favoring " 'moderate' candidates from the two major parties while excluding those who represent minor party perspectives." The ballot argument in favor of the passage of Proposition 14, included in a mailing to voters, stated, " 'Proposition 14 will help elect more practical office-holders who are more open to compromise.' " Then-state Senator Maldonado was allegedly quoted as stating the purpose of the process was to promote " 'pragmatic' political perspectives." "Pragmatic" and "practical" were, plaintiffs alleged, "code words demonstrating their intent to eliminate varying political perspectives from the statewide general election."

The trial court rejected plaintiff's claims, sustaining a demurrer to the complaint without leave to amend. Stated briefly, the trial court reasoned that the electoral system imposes no restriction on the access of minor-party candidates to the nonpartisan primary ballot and found no right to participate in the subsequent general election ballot, absent a top-two finish. Plaintiffs contend the trial court erred both procedurally, in failing to give them an opportunity to develop the factual basis for their claims, and substantively, in rejecting their constitutional arguments.

## II. DISCUSSION

### A. *Legal Background*

#### 1. *California's Top-Two System*

The top-two system was inserted into the California Constitution by Proposition 14, which was placed on the ballot by the Legislature in 2009 and passed by voters the following year. (Cal. Const., art. 2, § 5; Sen. Const. Amend. No. 4, Stats. 2009

4

(2009–2010 Reg. Sess.) res. ch. 2, pp. A-1–A-2; see generally *Field v. Bowen* (2011) 199 Cal.App.4th 346, 351 (*Field*).)  Under the system, statewide executive offices and state and federal legislative offices are designated "voter-nominated" offices. (Cal. Const., art. II, § 5, subd. (a); Elec. Code, § 359.5.)  Every other year in June, prior to the general election in November, a primary election is held for voter-nominated offices in which all voters and candidates, without regard to their party affiliation, are permitted to participate.  (Cal. Const., art. II, § 5, subd. (a); Elec. Code, §§ 359.5, 1200, 1201.)  The prerequisites for inclusion on the voter-nominated primary ballot are minimal:  the payment of a filing fee and the submission of a declaration of candidacy and nomination papers bearing the signatures of at most 100 nominators.  (Elec. Code, §§ 8020, subd. (a), 8040, 8041, 8062, subd. (a), 8103.)[3]

So long as they are affiliated with a "qualified" political party, the primary candidates may list their "party preference" on the election ballot.[4]  (Cal. Const., art. II, § 5, subd. (b); Elec. Code, §§ 5100, 13105, subd. (a).)  The primary election does not, however, result in the selection of party "nominees," which are defined by statute as party-affiliated candidates "who are entitled by law to participate in the general election for office."  (Cal. Const., art. II, § 5, subd. (b); Elec. Code, § 332.5.)  Rather, only the two candidates receiving the most votes in the primary election, regardless of party affiliation, advance to the general election.  (Cal. Const., art. II, § 5; Elec. Code, § 8141.5.)  Accordingly, no party is *entitled* to place a candidate on the general election ballot, and two candidates stating the same party preference may appear on the general election for the same voter-nominated office if they are the first and second place finishers.  (Elec. Code, § 8141.5.)  The Election Code expressly states the purpose of the primary is not "to

---

[3] A petition with an appropriate number of signatures can be submitted in lieu of the payment of the filing fee.  (Elec. Code, § 8106, subd. (a).)

[4] To become qualified, a political party must demonstrate significant public support through one of three statutorily prescribed methods.  (See Elec. Code, § 5100.) We take judicial notice that the Secretary's Web site lists all three minor-party plaintiffs as qualified political parties <https://www.sos.ca.gov/elections/political-parties/qualified-political-party.htm > (as of January 29, 2015).

determine the nominees of a political party"; rather, it "serves to winnow the candidates for the general election to the candidates receiving the highest or second highest number of votes cast at the primary election." (*Id.*, § 359.5, subd. (a).)

Proposition 14 effected a substantial change in the California electoral process. Prior to its passage, the primary election served to designate the party nominees for what are now voter-nominated offices. Those nominees were selected by the vote only of members of the party they represented. Each qualified party was entitled to place one, and only one, nominee on the general election ballot. (See Elec. Code, former §§ 2151, 15451; *Field, supra*, 199 Cal.App.4th at p. 351.) While parties no longer have the right to place a candidate on the general election ballot for voter-nominated offices, the Elections Code allows parties to use "any other lawful mechanism . . . for the purposes of choosing the candidate who is preferred by the party for a . . . voter-nominated office." (*Id.*, § 332.5.) Political parties may endorse, support, or oppose any candidate for such offices. (Cal. Const., art. II, § 5, subd. (b); Elec. Code, § 332.5.)

## 2. *Constitutional Limitations on State Electoral Regulation*

Beginning with *Williams v. Rhodes* (1968) 393 U.S. 23 (*Williams*), the Supreme Court decided a series of cases evaluating electoral laws that had the effect of restricting the access of independent and minor-party candidates to the ballot.[5] Judged largely under the federal equal protection clause, the laws typically created financial barriers to candidacy or imposed different ballot qualification requirements for such candidates. (*Clements v. Fashing* (1982) 457 U.S. 957, 964–965 (*Clements*).) The court recognized such laws "place burdens on two different, although overlapping, kinds of rights—the

---

[5] We will be considering federal decisions almost exclusively. The California Supreme Court's decisions in this area have been limited, and the court's most recent decision held that it "has followed closely" the federal First Amendment analysis in evaluating challenges to electoral laws under the free speech provisions of the California Constitution. (*Edelstein v. City and County of San Francisco* (2002) 29 Cal.4th 164, 174, 179.) The decision instructs reviewing courts not to depart from the federal analysis unless there are "cogent reasons to do so." (*Id*. at p. 179.) Plaintiffs do not distinguish between the state and federal Constitutions in their arguments and have made no attempt to provide "cogent reasons" for departing from federal authority.

right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms." (*Williams*, at p. 30.)

In the course of these decisions, the court recognized the constitutional protection given to the participation of minor parties and unaffiliated candidates in the electoral process. "A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. It discriminates against those candidates and—of particular importance—against those voters whose political preferences lie outside the existing political parties. [Citation.] By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce diversity and competition in the marketplace of ideas. Historically political figures outside the two major parties have been fertile sources of new ideas and new programs; many of their challenges to the status quo have in time made their way into the political mainstream. [Citations.] In short, the primary values protected by the First Amendment—'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,' [citation]—are served when election campaigns are not monopolized by the existing political parties." (*Anderson v. Celebrezze* (1983) 460 U.S. 780, 793–794 (*Anderson*).)

Posed against the interest of minor parties and independent candidates in unfettered access to the ballot are the states' "broad powers to regulate voting." (*Williams, supra*, 393 U.S. at p. 34.) "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." (*Storer v. Brown* (1974) 415 U.S. 724, 729–730 (*Storer*).) "States have important interests in protecting the integrity of their political processes from frivolous or fraudulent candidacies, in ensuring that their election processes are efficient, in avoiding voter confusion caused by an

7

overcrowded ballot, and in avoiding the expense and burden of run-off elections."
(*Clements, supra*, 457 U.S. at p. 965.)

Given these competing, and potentially conflicting, interests, "It has never been suggested that the [Constitution] automatically invalidates every substantial restriction on the right to vote or to associate. Nor could this be the case under our Constitution where the States are given the initial task of determining qualifications of voters who will elect members of Congress." (*Storer, supra*, 415 U.S. at p. 729.) "[T]he rule fashioned by the Court to pass on constitutional challenges to specific provisions of election laws provides no litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause. The rule is not self-executing and is no substitute for the hard judgments that must be made. Decision in this context, as in others, is very much a 'matter of degree,' [citation], very much a matter of 'consider[ing] the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.' " (*Id.* at p. 730.) The reviewing court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional." (*Anderson, supra*, 460 U.S. at p. 789.) "The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the 'availability of political opportunity.' " (*Clements, supra*, 457 U.S. at p. 964.) Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review. (*Timmons v. Twin Cities Area New Party* (1997) 520 U.S. 351, 358 (*Timmons*).) "[T]he State's important regulatory interests are generally

sufficient to justify reasonable, nondiscriminatory restrictions." (*Anderson*, at p. 788, fn. omitted.)

### 3. *The Constitutionality of Open Primaries*

The top-two system represents a qualitative change in the manner in which general election candidates have traditionally been selected in the United States. The Supreme Court cases from the last century establishing the electoral interests of minor parties generally featured primary elections whose purpose was to permit voters from the participating parties to select the parties' general election nominees, rather than to narrow the range of candidates in a nonpartisan manner. The principle concern of these earlier ballot access decisions was to ensure minor parties did not suffer undue barriers to placing their candidates on the ballot, relative to their major-party brethren. In the context of the traditional system, however, the court rejected any absolute right of minor-party candidates to appear on the ballot, finding "an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." (*Jenness v. Fortson* (1971) 403 U.S. 431, 442 (*Jenness*); see *Munro v. Socialist Workers Party* (1986) 479 U.S. 189, 193–195 (*Munro*).)

The states' electoral approach had begun to evolve by the time of *California Democratic Party v. Jones* (2000) 530 U.S. 567 (*Jones*), in which the court considered a constitutional challenge to a so-called "blanket primary," a variant of the traditional primary. Although the purpose of the blanket primary was to select party nominees, all primary election candidates were listed on a single ballot and voters were permitted to vote for the candidate of their choice, without regard to their party membership. Because the candidate from each political party receiving the most votes became the party's nominee, each party's nominee was determined, in part, by nonmembers. (*Id.* at p. 569.) In *Jones,* a major party contended the blanket primary violated its rights of association by forcing it to accept the participation of nonmembers in the selection of its nominees. The Supreme Court agreed, noting, "In no area is the political association's right to exclude

9

more important than in the process of selecting its nominee." (*Id.* at p. 575.) Because the court found a significant burden on associational rights, it applied strict scrutiny and found the state's asserted interests in support of the blanket primary, including the selection of more centrist candidates in "safe" districts, less than compelling. (*Id.* at pp. 580, 582, 584.)

In addition to finding the state's asserted interests in the blanket primary not compelling, the court noted there was a more narrowly tailored alternative to accomplish the state's purpose: the nonpartisan open primary, followed by a top-two runoff election. (*Jones, supra*, 530 U.S. at p. 585.) As the court held, the top-two system "has all the characteristics of the partisan blanket primary, save the constitutionally crucial one: Primary voters are not choosing a party's nominee. Under a nonpartisan blanket primary, a State may ensure more choice, greater participation, increased 'privacy,' and a sense of 'fairness'—all without severely burdening a political party's First Amendment right of association." (*Id.* at pp. 585–586.) The *Jones* court thereby gave its constitutional imprimatur to the top-two system, at least in dictum.

In *Washington State Grange v. Washington State Republican Party* (2008) 552 U.S. 442 (*Washington State Grange I*), the Supreme Court formally addressed the constitutionality of the top-two system, confirming it withstands the type of constitutional challenge asserted in *Jones*. The court rejected the argument, at least as a facial challenge, that an open nonpartisan primary was not materially different from a blanket primary because the prevailing candidate affiliated with a particular party in the nonpartisan primary would become the party's "de facto" nominee in the general election. (*Washington State Grange I,* at pp. 452–453.) While *Washington State Grange I* is not dispositive here, since it considered only the impact of the top-two system on parties' interest in selecting their own nominees, *Jones* and *Washington State Grange I* refute any claim that the system necessarily burdens associational and ballot access rights.

Since *Washington State Grange I,* the top-two system has been sustained against a series of other constitutional challenges, although not the precise challenges asserted by

plaintiffs here. Following remand in *Washington State Grange I*, the Ninth Circuit rejected a claim by the Libertarian Party that its "fundamental right of access to the ballot" was violated because the top-two system "makes it difficult for a minor-party candidate to progress to the *general* election ballot." (*Wash. State Republican Party v. Wash. State Grange* (9th Cir. 2012) 676 F.3d 784, 793, 794 (*Washington State Grange II*).) In making the argument, the party relied primarily on *Anderson*, which found that a March deadline for the filing of candidacy petitions by independent candidates for the November general election violated their voting and associational rights because it arose several months before the major parties designated their candidates in the primary. As the Ninth Circuit explained, *Anderson* "held that the early filing deadline placed an unconstitutional burden on voting and associational rights because it prevented independents from taking advantage of unanticipated political opportunities that might arise later in the election cycle and required independent candidates to gather petition signatures at a time when voters were not attuned to the upcoming campaign." (*Washington State Grange II,* at p. 794.) In finding no similar flaw in the top-two system, the court noted the Washington primary occurred in August, not March, and the system treated major- and minor-party candidates alike, in contrast to the electoral law rejected in *Anderson*. (*Washington State Grange II,* at pp. 794–795.)[6]

In *Field, supra*, 199 Cal.App.4th 346, the court upheld California's top-two system against the claim it violates the constitutional rights of candidates who are not affiliated with a qualified party because it requires such candidates to state "no party

---

[6] The trial court relied heavily on the Ninth Circuit's decision in *Washington State Grange II* in ruling against plaintiffs, and plaintiffs extensively criticize the decision and distinguish California's top-two system from that of Washington State. While we find the distinctions largely unpersuasive, we conclude the constitutional arguments made by plaintiffs in the present lawsuit are substantively different from those considered by the Supreme Court and Ninth Circuit in the *Washington State Grange* cases. To the extent plaintiffs intend to repeat their claim in the complaint that the gap between the June primary and November general election is significant under *Anderson,* however, we agree with the Ninth Circuit that it does not render the top-two system unconstitutional. (*Washington State Grange II, supra,* 676 F.3d at pp. 794–795.)

11

preference" on the ballot or to leave their party preference blank, rather than permitting them to designate themselves as independent or aligned with a nonqualified party. (*Id.* at pp. 355–360.) It also rejected a constitutional challenge to the absence of write-in votes in the general election.[7] (*Id.* at pp. 366–370.) Essentially the same arguments were rejected in *Chamness v. Bowen* (9th Cir. 2013) 722 F.3d 1110 at pages 1115, 1116–1121.

## B. *Plaintiffs' Contentions*

Plaintiffs assert a somewhat different series of challenges to the constitutionality of the top-two system. First, they argue the top-two system denies their candidates the constitutional right to appear on the general election ballot if the parties have demonstrated a " 'modicum of support.' " Second, they contend the top-two system's typical elimination of minor-party candidates in the primary election severely burdens their voting and associational rights by restricting their participation in the election process to the primary, when voter attention and participation are substantially less than at the time of the general election.[8] Finally, they contend the top-two system violates their right to equal protection of the laws by "withdrawing [their] access to the general election."[9]

We review independently a trial court's ruling sustaining a demurrer without leave to amend. (*Arce v. Childrens Hospital Los Angeles* (2012) 211 Cal.App.4th 1455, 1470

---

[7] Plaintiffs allude in their briefs to the absence of write-in votes at the general election. To the extent plaintiffs intend to raise that absence as a constitutional claim here, we follow *Field* in rejecting it.

[8] Although plaintiffs appear to articulate the first two arguments separately, their briefs mix them indiscriminately, at times treating the two arguments as aspects of a single argument. This mixing has the effect of confusing the constitutional issues raised by the top-two system, and for clarity we analyze them separately.

[9] In arguing their case, plaintiffs make no attempt to distinguish between the impact of Proposition 14 on the rights of the parties, the party members, and the parties' candidates. Rather, they argue their case from the perspective of the party plaintiffs, without articulating any separate arguments on behalf of the individual plaintiffs. We take the same approach, evaluating their arguments from the perspective of the party plaintiffs. We are not persuaded the individuals could make materially different arguments.

(*Arce*).)  Normally we would apply the California standard of review for grant of a demurrer, which requires us to "review the allegations of the operative complaint for facts sufficient to state a claim for relief."  (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 866.)  Because plaintiffs' claims are pleaded under section 1983 of title 42 of the United States Code, however, we apply the federal standard for review of the grant of a motion to dismiss.  Under that standard, "dismissal is proper only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims that would entitle him to relief.' " (*Arce*, at p. 1471.)  Either way, we " 'must assume the truth of the complaint's properly pleaded or implied factual allegations.  [Citation.] . . . In addition, we give the complaint a reasonable interpretation, and read it in context.' " (*Id.* at p. 1470.)

### 1. *The Right to Appear on the General Election Ballot*

We find no support for plaintiffs' claim of a constitutional right to have their candidates appear on the general election ballot upon the showing of a modicum of support, as the term "general election" is used in California's top-two system.  The minor parties unquestionably have a right to fair and equal participation in the process by which officeholders are selected, but this right is satisfied by participation in an open nonpartisan primary election in which every candidate has an equal opportunity, regardless of party affiliation, to advance to the general election.

In the various ballot access cases, the Supreme Court was required to resolve the balance between the electoral rights of would-be candidates who lacked the support of the major parties with the interest of the state in limiting the complexity of the ballot by screening out candidates who were unable to demonstrate a realistic chance of electoral success.  In the end, the court came down largely on the side of the minor-party and independent candidates, ruling they must be permitted on the ballot if they are able to demonstrate a "modicum" of public support.  (*Jenness, supra*, 403 U.S. at p. 442.)  In deciding these cases, the Supreme Court never distinguished doctrinally between access to the primary election and access to the general election.  The objective in each, from *Williams, supra*, 393 U.S. 23, on, was minor-party access to the *electoral process*—that

13

is, to the process that culminates in election to public office. A party's participation in a particular election was constitutionally relevant only as the means to the end of placing the party's candidates in a fair and equal position to be elected.

In applying the Supreme Court decisions addressing the right to ballot access, it is essential to recognize the difference between the electoral system enacted by Proposition 14 and the classic system considered in these decisions. In the classic system, the functions of the primary election and the general election were substantively different. The primary election settled "intraparty competition" by reducing the number of contenders within each party to a single nominee. (*American Party of Texas v. White* (1974) 415 U.S. 767, 781.) The general election then allowed the voters to choose among the parties' nominees. With the exception of independent candidates, the candidates in the general election were chosen by the party members, not by voters generally. The general election was therefore the first time the candidates faced the electorate, rather than solely the members of their own party.

While California has retained the designations "primary" and "general" election, the functions of the two elections have changed considerably from the classic system. As the Elections Code confirms, the purpose of the primary election is no longer to determine party nominees, but instead to narrow the slate of candidates. (*Id.*, § 359.5.) Membership in a qualified party is no longer a precondition to participation in the primary election, since the primary election no longer selects party nominees, and political parties therefore no longer play a formal role in determining the slate of candidates at either election. Rather, the primary election now allows the electorate to reduce the universe of all candidates to two, and the general election reduces those two to a single winner. Both elections are "general" elections, in the sense that the entire electorate votes in both elections and voters can select any of the candidates. In

14

substance, the classic primary election has been eliminated, and the general election has been expanded into a two-step process.[10]

Accordingly, for the purposes of the ballot access cases, access to California's primary election is constitutionally indistinguishable from access to the general election. Under the ballot access cases, there is no doubt that candidates who are able to demonstrate a "modicum of support" are entitled to a spot on the primary election ballot, since participation in the primary election is a necessary first step in the electoral process. In light of existing precedent, which authorizes the states to require a demonstration of the support of as much as 5 percent of the electorate for placement on the primary ballot (*Jenness, supra*, 403 U.S. at pp. 438–442), the minimal signature requirements imposed by the Elections Code easily pass constitutional muster. Further, and importantly, candidates affiliated with minor parties face exactly the same requirements for participation as those affiliated with the major parties.

Under the top-two system, advancement from the primary election to the general election requires a demonstration, not of a "modicum" of support, but of "top-two" electoral success. There is nothing inherently unconstitutional about this requirement. As the Supreme Court has noted repeatedly, the point of the electoral process is to determine the candidate with the most support among voters and eliminate the remainder. (See *Storer, supra*, 415 U.S. at p. 735 [the electoral process "functions to winnow out and finally reject all but the chosen candidates"].) The primary election is the first step in this process. Because Proposition 14 provides a full and fair opportunity for all candidates to compete for election on a materially equal basis, California's decision to split this process in two does not deprive plaintiffs of meaningful access to the ballot.

---

[10] The interveners characterize plaintiffs as challenging Proposition 14's elimination of an official role for political parties in the electoral process and argue the long-standing history of California's nonpartisan elections for, among others, judicial offices belies any constitutional claim based on a claimed right of parties to an official electoral role. We have scoured plaintiffs' briefs and find no trace of a challenge to this aspect of Proposition 14. Thus, we do not address such an argument.

A hypothetical illustrates the point. Plaintiffs' constitutional objection would appear to be mooted if California simply eliminated the general election and awarded elective office to the winner of the primary election. They could not complain they were unfairly denied access to the general election if elective office was awarded to the person who received the most votes in the primary election, since minor-party candidates would participate in the election with the same opportunity as any other candidate to win elective office. It is therefore difficult to imagine how California violates plaintiffs' electoral rights by deciding to conduct a runoff between the top-two primary candidates, rather than awarding elective office outright to the winner. On the contrary, plaintiffs are benefited by having a second shot at office in the event their candidate is a primary runner-up. Proposition 14 does nothing more than provide this second chance.

A somewhat similar system for narrowing participation in the general election was approved by the Supreme Court in *Munro, supra,* 479 U.S. 189. At the time, minor parties in the State of Washington, rather than choosing their nominee in the primary election, were required to select a nominee at a party convention for placement on the primary ballot. In order to advance to the general election ballot, that nominee was required to obtain at least 1 percent of the votes in a blanket primary, at which voters could cast their ballot for any primary candidate, regardless of party affiliation. (*Id.* at pp. 191–192.) After recognizing that states "may require a preliminary showing of significant support before placing a candidate on the general election ballot" (*id.* at p. 194), the court held: "The primary election in Washington . . . is 'an integral part of the entire election process . . . [that] functions to winnow out and finally reject all but the chosen candidates.' [Citation.] We think that the State can properly reserve the general election ballot 'for major struggles,' [citation], by conditioning access to that ballot on a showing of a modicum of voter support. In this respect, the fact that the State is willing to have a long and complicated ballot at the primary provides no measure of what it may require for access to the general election ballot. The State of Washington was clearly entitled to raise the ante for ballot access, to simplify the general election ballot, and to avoid the possibility of unrestrained factionalism at the general election." (*Id.* at p. 196.)

16

The court acknowledged the 1-percent rule had the effect of excluding most minor-party candidates from the general election ballot (*id.* at pp. 196–197), but it found no constitutional deficiency in this exclusion, explaining: "Washington virtually guarantees . . . candidate access to a statewide ballot. . . . It is true that voters must make choices as they vote at the primary, but there are no state-imposed obstacles impairing voters in the exercise of their choices. Washington simply has not substantially burdened the 'availability of political opportunity.' " (*Id.* at p. 199.)

The 1-percent rule approved in *Munro* is constitutionally indistinguishable from the elimination of lesser candidates by the primary election under Proposition 14. In both cases, the primary election provided candidates equal opportunity to demonstrate success with the general electorate, and in both cases the slate of candidates was narrowed solely on the basis of their demonstrated electoral appeal. Just as in *Munro*, the effect is to "reserve the general election ballot 'for major struggles.' " (*Munro, supra*, 479 U.S. at p. 196.)

## 2. *Restriction to Participation in the Primary Election*

Plaintiffs also contend their rights of political expression are unconstitutionally burdened because the top-two system effectively limits their electoral efforts to the primary election, which occurs several months prior to the general election and ordinarily attracts less attention and voter participation than the general election. This contention is not premised on any alleged burden placed on the right to "cast their votes effectively." (*Williams, supra*, 393 U.S. at p. 30.) That is, plaintiffs neither allege nor argue their candidates' chances to gain elective office are prejudiced by the relative lack of voter participation in primary elections.[11] Rather, plaintiffs' concern is their candidates are

---

[11] Most obviously, plaintiffs do not allege that their candidates receive a smaller percentage of the vote by virtue of their participation in the primary election, thereby making it more difficult for them to advance to the general election. One could imagine, on the contrary, that minor-party supporters might be more engaged in the political process and therefore would be more likely to vote in the primary election than major-party members. Accordingly, the splitting of the general election into two steps may

17

excluded from the ballot at the time when they would have the largest audience for their electoral activities.

As discussed above, we resolve such a claim by evaluating the significance of the interests advanced by the plaintiffs and the degree to which those interests are burdened by the electoral regulation, and weighing against this burden the interests advanced by the state to justify it. (See *Anderson, supra*, 460 U.S. at p. 789.)

We find any burden placed on plaintiffs' expressive rights by their alleged relegation to the primary to be modest. It is important to recognize that plaintiffs are not excluded from the electoral process altogether. Because minor parties are permitted to promote candidates in the primary election on the same terms as any other party, plaintiffs are fully able to communicate their message through the electoral process at that time. Further, even at the time of the general election, plaintiffs are in no way excluded from many expressive activities associated with the electoral process. Even without a candidate on the ballot in November, plaintiffs may organize their members, communicate their message through advertising and events, support or oppose candidates who are on the ballot, and engage in any other appropriate political activity. The lack of a candidate in no way prevents plaintiffs from participating in the various election-related political activities at the time of the general election. It merely prevents them from using a candidacy as the vehicle for such activities.

Plaintiffs point out that because of the common failure of minor-party candidates to reach the general election under the top-two system, minor parties are generally denied access to certain expressive activities that are available only to parties with a candidate on the general election ballot, notably the opportunity to state their views in the official voter pamphlet and the chance to participate in candidate debates. Even when these opportunities are denied them, however, the minor parties have access to a variety of other political activities and avenues of communication at the time of the general

---

actually promote the electoral success of minor-party candidates. In any event, there is no allegation their electoral performance suffers under the top-two system.

election, as noted above.  Further, they can take advantage of the full range of activities at the time of the primary election.  The absence of a candidate on the general election ballot therefore places at most a modest burden on their efforts to communicate their message to the electorate.[12]

Particularly relevant to plaintiffs' claim is *Timmons, supra*, 520 U.S. 351, in which the Supreme Court considered a state law that precluded a single candidate from appearing on the ballot as a nominee for more than one political party.  Both the *Timmons* respondent, a minor party, and a larger party had nominated the same person for a state legislative office.  Because that candidate chose to be listed as the nominee of the larger party, the effect of the law was to preclude the minor party from listing its nominee as such on the ballot.  In holding the preclusion did not place a "severe[] burden" on the minor-party members' rights of association, the court reasoned the regulation applied equally to all parties, did not interfere in the party's internal affairs, and did not prevent the party from "developing and organizing."  (*Id.* at pp. 359, 360–361.)  As the court noted, even without a candidate on the ballot, the party was not excluded "from participation in the election process.  [Citations.]  The . . . Party remains free to endorse whom it likes, to ally itself with others, to nominate candidates for office, and to spread its message to all who will listen."  (*Id.* at p. 361.)  In considering the party's claim the ban burdened its right to communicate the identity of its nominee, the court held it was "unpersuaded, however, by the Party's contention that it has a right to use the ballot itself

_____

[12] As noted above, plaintiffs tend to mix the first two claims in making their appellate arguments.  For example, they claim without explanation in their reply brief that the top-two system "deprives a large majority of California voters from accessing diverse political viewpoints when they elect candidates for statewide office."  Plaintiffs' ambiguous use of the term "accessing . . . political viewpoints" could refer to receiving political messages, or it could refer to voting for candidates advocating those messages.  Assuming the first meaning, nothing in the top-two system prevents the minor parties from communicating their political views at the time of the general election or voters from "accessing" those views.  The top-two system merely precludes the minor parties from using the vehicle of a candidacy for that purpose.  To the extent plaintiffs intend the second meaning, we reject their argument for the reasons stated in section II.B.1., *ante*.

19

to send a particularized message . . . . Ballots serve primarily to elect candidates, not as fora for political expression. [Citation.] . . . The Party retains great latitude in its ability to communicate ideas to voters and candidates through its participation in the campaign, and Party members may campaign for, endorse, and vote for their preferred candidate even if he is listed on the ballot as another party's candidate." (*Id.* at p. 363.) In the same way, plaintiffs remain free at the time of the general election to participate in expressive political activity, whether or not they have a candidate on the ballot.

An argument similar to plaintiffs' was made by the plaintiffs in *Munro*, who protested their exclusion from the general election by the requirement of a 1-percent vote in the primary. In arguing for the significance of the exclusion, the plaintiffs noted voter participation in primary elections was considerably less than in general elections. (*Munro, supra,* 479 U.S. at p. 198.) In finding the exclusion from the general election did not impose a severe burden for this reason, the court held: "States are not burdened with a constitutional imperative to reduce voter apathy or to 'handicap' an unpopular candidate to increase the likelihood that the candidate will gain access to the general election ballot. . . . [¶] . . . It can hardly be said that Washington's voters are denied freedom of association because they must channel their expressive activity into a campaign at the primary as opposed to the general election." (*Id.* at pp. 198–199.)

Weighed against the, at most, modest burden imposed on plaintiffs' expression are the state's asserted interests in replacing the partisan primary with a two-step general electoral process. In discussing the state's interests, the Secretary refers us to the official pamphlet distributed by the state to voters at the time of the election. (See *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 901 [court can look to official pamphlet to determine voters' intent in enacting an initiative].) In that pamphlet, the promoters of Proposition 14 argued to the voters it would improve the electoral process by (1) permitting independent voters to participate in the process of narrowing candidates for the general election, (2) allow individual primary election voters a wider range of candidate options, (3) lessen the influence of the major parties in selecting candidates,

20

and (4) "help elect more practical office-holders who are more open to compromise." (Ballot Pamp., Primary Elec. (June 8, 2010) argument in favor of Prop. 14, p. 18.)

The first interest alone is sufficient to justify the limited burden on minor-party associational rights imposed by the top-two system. (See *Washington State Grange I, supra*, 552 U.S. at p. 458.) According to records submitted by interveners, independent voters constituted 20.18 percent of the electorate in 2010.[13] Yet so long as the primary election served to select party nominees, the state was precluded by the Supreme Court's decision in *Jones, supra*, 530 U.S. 567, from granting independent voters the right to participate in the narrowing of candidates for the general election.[14] In effect, their choices at the general election could be determined for them by the members of the qualified parties. The top-two system, by moving away from a party-based primary election, gives to this substantial bloc of independent voters the right to participate equally in the important first stage of the electoral process. This rational and nondiscriminatory interest alone justifies any modest burden imposed by the top-two system on plaintiffs' associational interests. (See *Anderson, supra*, 460 U.S. at p. 788, fn. omitted ["the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions"].)

In discussing the state's interest, plaintiffs choose to focus on the final claim of the Proposition 14 promoters, contending an interest in narrowing the ideological range of candidates was ruled invalid in *Jones*. In that case, which held unconstitutional an open partisan primary, the Supreme Court found insufficient the state's declared interest in "broadening the range of choices *favored by the majority*" by facilitating the selection of

---

[13] Plaintiffs have submitted more recent data in a request for judicial notice, filed December 18, 2014, which we grant. According to the new data, the percentage of registered voters in California who state no party preference had increased to 23.29 percent by 2014. We also grant the parties' various requests for judicial notice submitting purported new authority.

[14] Consistent with the Supreme Court's ruling in *Jones,* nonaffiliated voters were permitted to vote in partisan primary elections only if the political parties consented to their participation. (Elec. Code, § 13102, subd. (b).)

21

less partisan party nominees. (*Jones, supra*, 530 U.S. at p. 584.) That ideological narrowing, however, was imposed by nonparty members on the parties. The Supreme Court quite rightly questioned whether the state had a valid interest in dictating to the parties the ideology of their nominees. By contrast, under the top-two system the electorate narrows its own choices in the general election through its voting in the primary, and any ideological choices are incidental to the process of narrowing the field of candidates. The narrowing process results in the two candidates favored by the largest number of voters and ensures the ultimate winner enjoys the support of a majority of voters. With respect to that interest, the Supreme Court recognized as long ago as *Williams* that "the State does have an interest in attempting to see that the election winner be the choice of a majority of its voters." (*Williams, supra*, 393 U.S. at p. 32.)

In their reply brief, plaintiffs lean heavily on *Anderson* to support their argument, but *Anderson* was concerned primarily with access to the ballot, rather than the expressive activities incidental to candidacy. As noted above, the *Anderson* court invalidated a filing deadline that required independent and new-party candidates to file for election well in advance of established party candidates, reasoning the early filing requirement could limit the range of candidates available to the electorate because independent and new-party candidacies often arose in reaction to the activities of the other parties. (*Anderson, supra*, 460 U.S. at p. 792.) As the court explained, "The right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are 'clamoring for a place on the ballot.' " (*Id.* at p. 787.) Accordingly, *Anderson* was concerned with a reduction in the range of candidates, rather than the expressive activities associated with candidacy. As discussed at length in the section II.B.1., *ante*, the top-two system provides an equal "place on the ballot" for minor- and major-party candidates. It therefore does not limit the range of candidates available to the voters in the manner that motivated the *Anderson* court.

### 3. *Equal Protection*

Plaintiffs' equal protection claim, as articulated in their opening brief, is considerably different from the allegation of impermissible motive in their complaint.

22

Plaintiffs now contend their right to equal protection was violated because, under the top-two system, they no longer have a guaranteed spot on the general election ballot. Perhaps anticipating the argument that they never had a right to appear on the general election ballot, plaintiffs argue, citing *Romer v. Evans* (1996) 517 U.S. 620 (*Romer*), that the equal protection clause "forbids the unjustified withdrawal of an established privilege or protection from a class of disfavored individuals, even if that right may not have been required by the Constitution in the first place."

The equal protection clause " 'requires that all persons subjected to . . . legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed.' [Citation.] When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to ensure that all persons subject to legislation or regulation are indeed being 'treated alike, under like circumstances and conditions.' " (*Engquist v. Oregon Dept. of Agriculture* (2008) 553 U.S. 591, 602.)

The success of plaintiffs' claim that they are denied equal protection by the top-two system is gravely hampered by the system's manifestly equal treatment of all qualified political parties. All candidates who file the necessary papers are entitled to a place on the primary ballot, regardless of their party preference. No greater requirements are placed on candidates expressing a preference for a minor party. Similarly, all successful primary election candidates are entitled to advance to the general election, regardless of their party preference. Candidates listing a preference for a minor party who appeal to a sufficiently broad swath of the electorate have the same opportunity to advance as similar candidates expressing a preference for a major party. There simply is no distinction, invidious or otherwise, made by Proposition 14 on the basis of party preference.

Taking plaintiffs' characterization of the holding of *Romer* at face value, by plaintiffs' own admission an equal protection violation does not occur under *Romer* unless an established privilege has been withdrawn from "a class of disfavored individuals." In *Romer,* that disfavored group was persons with a same-sex or bisexual

23

orientation.  (*Romer, supra*, 517 U.S. at p. 624.)  At issue was a provision of the Colorado Constitution prohibiting the enactment of laws to protect persons from discrimination on the basis of " 'homosexual, lesbian or bisexual orientation, conduct, practices or relationships.' "  (*Ibid.*)  The constitution had no similar ban on the protection of other classes of persons from discrimination.  (*Ibid.*)  The top-two system, in contrast, makes no analogous distinction among candidates or political parties.  The established privilege cited by plaintiffs—the right to place a party nominee on the general election ballot—has been withdrawn from all political parties equally.  Under Proposition 14, there is no "disfavored" class of parties.

Plaintiffs base their equal protection argument not on the elements of the electoral system but on its impact, which they contend is more severe for minor-party candidates. While plaintiffs contend the top-two system prevents minor-party candidates from advancing to the general election, it has exactly the same impact on major-party candidates who fail to garner a top-two finish.  As statistics provided by the Secretary to the trial court demonstrate, 30 major-party candidates in the 2012 primary election received 20 percent or more of the vote and failed to advance to the general election. When precluding access to the general election ballot, the statute makes no distinction on the basis of party affiliation.  Plaintiffs allege, nonetheless, that minor-party candidates are more severely disadvantaged by the top-two system because they fail to advance far more often than major-party candidates.  The cause of this disparity, however, does not lie in the electoral system.  Rather, the differential failure to advance is a direct result of the minor-party candidates' failure to attract the votes of a sizeable portion of the electorate.  The state has no equal protection obligation to compensate for the minor parties' lack of general electoral appeal.  (*Munro, supra,* 479 U.S. at p. 198.)

In their reply brief, plaintiffs reprise the claim made in the complaint that the voters enacted Proposition 14 with the "improper purpose" of eliminating minor-party candidates from the general election ballot, relying on statements in the voter pamphlet. By failing to raise this argument in their opening brief, plaintiffs waived it.  (*Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1426.)  In any event, nothing in the ballot

24

pamphlet or the statements pleaded in the complaint suggests an intent, either among the promoters of Proposition 14 or the voters, specifically to disadvantage minor-party candidates. The change in the electoral system may have had the effect of diminishing the minor parties' presence on the general election ballot, but there is nothing to suggest this was an objective of the promoters and the voters.[15]

### 4. *The Trial Court's Grant of a Demurrer*

Plaintiffs argue that the trial court was required to permit them "to investigate the historical record, analyze statistical data, and develop expert testimony" before it could evaluate the nature of the burden imposed on their constitutional rights and weigh that burden against the state's asserted interests. In order to earn the right to make an evidentiary record, however, plaintiffs were first required to satisfy Code of Civil Procedure section 425.10, by pleading facts sufficient to support their causes of action. For the reasons explained above, we agree with the trial court that, after two opportunities to amend their initial complaint, plaintiffs failed to plead facts demonstrating the unconstitutionality of Proposition 14. Nor does it appear plaintiffs could prove such facts. Plaintiffs suggest no different set of facts they would have pleaded if granted leave to amend. The demurrer was, therefore, properly sustained.

Plaintiffs argue a demurrer was inappropriate because they intend to make an "as applied" challenge to Proposition 14, rather than a facial challenge. (See generally *Washington State Grange I, supra*, 552 U.S. at pp. 449–451.) Generally, a facial challenge to the constitutionality of legislation "considers only the text of the measure itself, not its application to the particular circumstances of an individual." (*Tobe v. City*

---

[15] Because we find no substance to plaintiffs' "improper purpose" argument, we deny the interveners' motion to strike this portion of plaintiffs' reply brief. We also deny the separate motions for judicial notice submitted by plaintiffs and interveners. Plaintiffs' motion seeks judicial notice of voter statistics that do not add materially to the evidence and allegations already in the record. Interveners' request addresses a legal argument plaintiffs made below, that Proposition 14 makes it more difficult for minor parties to remain qualified by obtaining a 2-percent vote in the gubernatorial general election. Plaintiffs have not raised that argument on appeal.

25

*of Santa Ana* (1995) 9 Cal.4th 1069, 1084.)  In contrast, an "as applied" challenge to the constitutionality of legislation involves an otherwise facially valid measure that has been applied in a constitutionally impermissible manner.  This type of challenge "contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the [measure] has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right." (*Ibid.*)

Plaintiffs' argument confuses pleading with proof.  A plaintiff who asserts an as applied constitutional challenge is not excused from procedural pleading requirements.  As discussed above, to avoid dismissal on demurrer, plaintiffs were required to plead facts supporting the elements of their claims.  This is equally true of as applied and facial constitutional challenges.  (See *Stone v. Board of Election Com'rs for City of Chi* (7th Cir. 2014) 750 F.3d 678, 686 ["there is nothing remarkable about granting a motion to dismiss in an election-law case if careful consideration of the complaint shows that the plaintiff has not stated a claim"].)

## III.  DISPOSITION

The judgment of the trial court is affirmed.

_____
Margulies, J.

We concur:

_____
Humes, P.J.

_____
Banke, J.

26

Trial Court:   Alameda County Superior Court

Trial Judge:   Hon. Lawrence John Appel

Counsel:

Siegel & Yee, Dan Siegel and Michael Siegel for Plaintiffs and Appellants Michael Rubin, Steve Collett, Marsha Feinland, Charles L. Hooper, Katherine Tanaka, C. T. Weber, Cat Woods, Green Party of Alameda County, Libertarian Party of California, and Peace and Freedom Party of California.

Business, Energy, and Election Law, PC, and Gautam Dutta for Green Party of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Douglas J. Woods, Assistant Attorney General, Mark R. Beckington and Peter H. Chang, Deputy Attorneys General for Defendant and Respondent Alex Padilla, as Secretary of State.

Nielsen, Merksamer Parrinello Gross & Leoni, James R. Parrinello, Marguerite Mary Leoni and Christopher E. Skinnell for Interveners and Respondents Independent Voter Project, David Takashima, Abel Maldonado and Californians to Defend the Open Primary.